## NEWTON et al. v. RHOADS BROTHERS.
### (No. 1002—5349.)

Commission of Appeals of Texas, Section B. Feb. 19, 1930.

Gibson, Lovett & Lovett, of Corsicana, and Fred S. Rogers, of Bonham, for plaintiffs in error.

Taylor & Howell, of Corsicana, and Frazier & Averitte, of Hillsboro, for defendants in error.

LEDDY, J. Plaintiffs in error complain of the holding of the Court of Civil Appeals [11 S.W.(2d) 377] approving the action of the trial court in peremptorily instructing the jury to return a verdict against them, asserting that the testimony favorable to their cause of action raised an issue of fact which it was proper to submit to the jury.

The question presented requires a brief review of the testimony favorable to the cause of action asserted, which is one for illegally restraining plaintiff in error Mrs. S. A. Newton of her liberty.

The defendants in error owned and operated a jewelry store in the city of Corsicana. Plaintiff in error Mrs. Newton, who resided in Bonham, Tex., was visiting an acquaintance in that city. On the 28th day of October, 1927, she, in company with a Miss Jack, of Amarillo, went into defendants in error's store for the purpose of enabling Miss Jack to inspect some mountings. Mrs. Newton's version as to what occurred in the store follows:

"When we got back into the store I walked to the counter where the Clerk was. I had already talked to one of the employees before, and I spoke to her, and said that we wanted to see some diamond mountings, and she (the Clerk) then went behind the counter, and we were talking about them. These mountings were in a regulation Jewelry case. This case was about twelve (12) inches square. As to how many stones, or mountings, were in this container, I will say it was full—there were about twenty-five (25) or thirty (30). She (the Clerk) got this container containing the mountings out of a case (show case), a glass show case on the inside of the store. She (the Clerk) opened up the tray and put them on top of the show case. We stood there and examined the stones and mountings, and discussed them.

"Then I told Miss Jack that I was going to see about getting a shine, and I walked out of

the store. I had told Miss Jack that I would meet her there, or at the car, and I went into the shine shop and the negro was not there, and while I was standing there waiting for him an officer came up to me (a Mr. Griffin) and spoke to me. I did not speak to him, because I did not know him, and he said to me, 'Were you in Rhoads Brothers Jewelry Store just now?', and he then told me that one platinum mounting was gone, and asked me if I would go back there with him. I realized that he was an officer. He talked with authority, and there was no doubt in my mind but that he was an officer. I went back with him into the store.

"When we started out (of Big Four Shoe Shop) we met Mr. Nutt, and we walked on ahead of him, and I walked on into the Jewelry Store first. Miss Jack was still there in Rhoads Brothers and when I came back in I wanted to know about this mounting, and the girl (Clerk) said it was not there. I wanted to know what they meant by this, and she said that when she opened the tray it had been there, and when I had left there it was gone, and that she knew that I had examined the mounting. I told her that I did not have the mounting, but that I had seen them. When I walked back in there Mr. Reid was standing there with Miss Jenkins. I said that I did not have the mounting, but that I was willing to be searched, and he (Mr. Reid) insisted that I be searched, and asked Miss Jenkins to search me in the back of the store, but Mr. Nutt kept them from doing that. Mr. Nutt said that if I was not guilty of it (getting the mounting) I would not mind being searched, and Mr. Nutt also said that it was not necessary and for them to wait a few minutes. Mr. Nutt then asked me who my father was and whom I was visiting.

"There were present in the store at the time Mr. Griffin, Mr. Nutt, Miss Jack, Mr. Reid, Miss Jenkins, and I believe that is all. There were no other customers; they kept me there about thirty (30) minutes. No one left the store while I was there except Miss Jenkins, who went to Mr. Rhoads' home to find Mr. Rhoads.

"When Miss Jenkins returned she said, 'I am very sorry. I have made a mistake.' That Mr. Rhoads had taken the stone out without their knowledge of it. This affected me—I was more than humiliated, not only just then, but it lasted for several days, and after that I felt like I had really had it. As to my physical condition, I was a nervous wreck for a week afterwards—every night I had to take medicine. This lasted for about a week."

The officer, Griffin, who caused Mrs. Newton to return to the jewelry store, testified that, when he reached defendant in error's store in response to the call made to the police station, Miss Jenkins, the clerk, stated she had missed a $450 mounting, and that there were two ladies looking at them, one of whom was still there, and the other was in the Big Four Shoe Store; that the mounting was in the case when she took the tray out, but that after Mrs. Newton had gone they missed it; that in response to his request Miss Jenkins went to the Big Four Shoe Store, and pointed out Mrs. Newton to him. As to what occurred subsequently, the officer testified:

"I spoke to Mrs. Newton, and asked her if she had been in Rhoads Brothers' Jewelry Store a few minutes before, and she said that she had. I asked her if she had been looking at mountings, and she said that she had been, and I told her that they had missed one since she left, and asked her if she would return with me, and she said that she would be glad to go back with me. I did not take hold of Mrs. Newton; nor did I then, or at any other time arrest her. We turned around and started back, and we met Mr. Nutt at the door, and when we got into Rhoads Brothers' Store, Mr. Nutt took charge, and she (Mrs. Newton) got in front of the show case, and tried to hand me her purse, but I would not take it. Mr. Nutt, nor I, neither had hold of her as we came into the front door of the store. She was about eight (8) or ten (10) feet in front of us when we came back to the store. She offered to let me search her purse, but I refused. I remained in the store until the transaction was closed. I did not hear any one demand that Mrs. Newton be searched. I do not think that I did. No one searched her. I did not hear any one accuse her of the theft of the platinum mounting. I did not, at any time, tell Mrs. Newton that she was under arrest; nor did I intend to arrest her. I would not have arrested her under any circumstances."

Bruce Nutt, Griffin's companion officer, testified that Miss Jenkins told him "that when they put the tray out, it (the mounting) was there, and that when she (Mrs. Newton) left, it was gone."

Does the evidence, when most favorably construed in behalf of plaintiffs in error, raise the issue that Mrs. Newton was illegally restrained of her freedom?

■ "False imprisonment" may arise without an actual arrest, assault, or imprisonment, and may be committed by words alone or by acts alone, or by both. A. Harris & Co. v. Caldwell (Tex. Civ. App.) 276 S. W. 298; Riley v. Stone, 174 N. C. 588, 94 S. E. 434.

■ Any intentional conduct that results in the placing of a person in a position where he cannot exercise his will in going where he may lawfully go constitutes false imprisonment. Cullen v. Dickinson, 33 S. D. 27, 144 N. W. 656, 50 L. R. A. (N. S.) 987, Ann. Cas. 1916B, 115. It is committed by the use of any means which restrains the party detained from moving from one place to another as he may see proper. Woods v. State,

3 Tex. App. 204; Harkins v. State, 6 Tex. App. 452.

■ We conclude that, under all the facts and circumstances the question as to whether Mrs. Newton was illegally restrained of her liberty by the officer, at the instigation of the agent of the defendants in error, was one of fact for the jury. It is true the officers deny there was any arrest of Mrs. Newton, or that they in any way restrained her of her liberty. But the evidence shows that these officers, who were charged with the duty of enforcing the law, were presented with cogent circumstances tending to show that Mrs. Newton had stolen a valuable piece of jewelry which was then in her possession. If, under such circumstances, when the officer first accosted her, he would not have permitted her to have gone on her way without detention, at least until further investigation could have been made, she was under an unlawful restraint. A jury might properly have inferred that, in view of the fact the officers had been informed by an ostensibly credible person that Mrs. Newton had unlawfully taken a valuable piece of jewelry from the store, which she, in all probability, had in her possession, they would not have permitted her, when she was first accosted in the Big Four Shoe Store, to have gone on her way unrestrained. Whether Mrs. Newton was at liberty to have done so we think was a question for the jury to determine under all the facts and circumstances shown in evidence. Stevens v. O'Neill, 51 App. Div. 364, 64 N. Y. S. 663.

■ Had the offense been committed, as represented by Miss Jenkins, the officer would have been authorized to have arrested Mrs. Newton without warrant, if she had attempted to go elsewhere when requested to go back to the store of the defendants in error. Article 215, Code of Criminal Procedure. With the officer having the power to make the arrest upon the information furnished, and such information tending strongly to show that Mrs. Newton had in fact unlawfully taken the mounting, the jury would not have been compelled to have accepted the testimony of the officer that he had no intention of arresting or restraining her of her liberty. It must be remembered that, at the time the officers were given direct and positive information strongly indicating Mrs. Newton was guilty of theft of the missing property, they were not acquainted with her, and had no knowledge as to whether she was an honest or dishonest woman. The matter cannot be viewed solely in the light of what the officers finally did when Mrs. Newton's innocence was conclusively established. It must be determined by the situation presented when it appeared she had in fact committed the crime with which she had been charged.

It is claimed that Mrs. Newton was not detained against her will because she voluntarily returned to defendants in error's store at the request of the officer. Mrs. Newton testified that she realized Griffin was an officer, and that, when he requested her to return to the store, she knew he spoke with authority. Under the circumstances, a lady of culture and refinement might treat the officer's request as a command. Whether she did so or not was an issue which should have been determined by the jury.

Defendants in error contend that, if Miss Jenkins caused or instigated the detention of Mrs. Newton, she was acting contrary to express instructions, as she had been instructed by them not to sell diamonds, because she did not possess sufficient information and knowledge of such gems.

■ If there was an illegal detention of Mrs. Newton, it arose from an effort on the part of the clerk to protect the property of her employer, which she believed had been stolen. We think the duty might be fairly implied that a clerk should use reasonable means to protect the property of his employer from being stolen, and if, while such clerk is in charge of his employer's property, he believes the same has been stolen, he is at least acting in the apparent scope of his employment when he adopts means reasonably calculated to prevent the thief from making his escape with such property. Had the surmise of defendants in error's clerk that Mrs. Newton had stolen the mounting been correct, we think her action in the premises could not have been questioned as not being in the line of her duty to her employers, and this would be true, notwithstanding the violation of her instructions not to sell diamonds. The fact that she violated such instructions would not lessen her duty to her employer to prevent such jewels from being stolen while she was assuming the custody thereof.

We recommend that the judgments of the trial court and the Court of Civil Appeals be reversed, and the cause remanded for another trial.

CURETON, C. J. Judgments of the District Court and Court of Civil Appeals both reversed, and cause remanded, as recommended by the Commission of Appeals.

We approve the holdings of the Commission of Appeals on the questions discussed in its opinion.